**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>WILLIAM HARRISON CALDWELL, II,<br><br>Debtor. | Bankruptcy Case No. 24-12634 TBM<br>Chapter 7 |
| PLR, L.L.C, and CYNTHIA NEWBY,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM HARRISON CALDWELL, II,<br><br>Defendant. | Adv. Pro. No. 25-01003 TBM |

# MEMORANDUM OPINION AFTER TRIAL

## I. Introduction.

Filing for bankruptcy gives companies and individuals who cannot afford to repay their debts the chance to "reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[1] But the Bankruptcy Code[2] has long prohibited debtors from discharging liabilities incurred on account of fraud and other dishonest behavior, allowing only the "honest but unfortunate debtor"[3] to discharge their debts through the bankruptcy process.

This Adversary Proceeding arises from the failure of a commercial real estate venture. Plaintiff and Creditor Cynthia Newby ("Mrs. Newby") formed an entity known as Esplanade Apartments, LLC ("Esplanade"). Esplanade's purpose was to develop real property previously owned by Mrs. Newby and her husband, Rodney Newby ("Mr.

---

1 *Grogan v. Garner,* 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (citation omitted)).

2 11 U.S.C. § 101 *et seq*. Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

3 *Grogan,* 498 U.S. at 286-7; *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'").

Newby") (together, the "Newbys"), into two residential apartment towers located at the intersection of Learned Avenue and 1000 West in Salt Lake City, Utah (the "Project"). Mr. Newby was manager of Esplanade and the Project. Later, Plaintiff and Creditor PLR, L.L.C. ("PLR"), an entity managed by the Newbys' friend and attorney, Mark Rinehart ("Mr. Rinehart"), was admitted as a member of Esplanade.

Unfortunately, the Project met with big trouble. The Newbys were defrauded by someone who absconded with $3.5 million of their money, leaving them without the funds they needed to move forward with the Project. Esplanade secured short-term loans, which the Newbys guaranteed. But, Esplanade defaulted. Under threat of imminent foreclosure, the Plaintiffs found Defendant and Debtor William Harrison Caldwell, II ("Mr. Caldwell"). Mr. Caldwell, a real estate investor, saw the promise of the Project. The Plaintiffs and Mr. Caldwell reached an agreement whereby Mr. Caldwell's entity, Caldwell Investments, LLC ("CIL"), purchased the Plaintiff's membership interests in Esplanade and paid off Esplanade's loans. As part of the transaction, Esplanade (now controlled by CIL) issued short-term carry-back promissory notes to the Plaintiffs in the aggregate amount of $600,000. Mr. Caldwell also guaranteed repayment.

After closing on the purchase of Esplanade, Mr. Caldwell secured a large loan, intending to construct the Project. But, the Covid 19 pandemic disrupted markets and a forest fire in Canada caused lumber prices to spike. The Project could not be completed. Though Esplanade made some payments to the Plaintiffs, it defaulted on the promissory notes. Mr. Caldwell caused Esplanade to file for bankruptcy. The Plaintiffs sued Mr. Caldwell for breach of contract in Utah state court, obtaining a $876,402.44 judgment against him for breach of his guaranty. Then, Mr. Caldwell filed for personal bankruptcy.

The Plaintiffs initiated this Adversary Proceeding on January 6, 2025. In their Complaint,[4] the Plaintiffs assert four claims for relief against Mr. Caldwell for nondischargeability of debt under Sections 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6). Mr. Caldwell concedes that he owes a debt (in the amount of $876,402.44) to the Plaintiffs but contends that such debt is fully dischargeable in bankruptcy. The Court conducted a trial on the dispute. For the reasons set forth below, the Court dismisses the Plaintiffs' nondischargeability claims against Mr. Caldwell.

## II. <u>Jurisdiction and Venue</u>.

Pursuant to 28 U.S.C. § 1334, this Court has subject matter jurisdiction to adjudicate nondischargeability of debt under Section 523(a). Such issue is a core proceeding per 28 U.S.C. §§ 157(b)(2)(A)(matters concerning administration of the estate), (b)(2)(I)(determinations as to the dischargeability of particular debts), and

---

[4] Adversary Proceeding Docket No. 1. Unless otherwise indicated, the Court will refer to particular documents from the CM/ECF docket for the main Bankruptcy Case, *In re William Harrison Caldwell, II*, Case No. 24-12634 (Bankr. D. Colo.) using the convention: "Main Case Docket No. ___." Similarly, the Court will refer to particular documents from the CM/ECF docket for this Adversary Proceeding, *PLR, L.L.C., and Cynthia Newby v. William Harrison Caldwell, II (In re William Harrison Caldwell, II)*, Adv. Pro. No. 25-1003 (Bankr. D. Colo.), using the convention: "Adversary Proceeding Docket No. ___."

(b)(2)(O)(other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship). Both the Plaintiffs and Mr. Caldwell knowingly and voluntarily confirmed their consent to this Court's entering final judgment on the claims and defenses.[5] Accordingly, this Court has jurisdiction over the subject matter of this Adversary Proceeding. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 674-683 (2015) (bankruptcy court may enter final judgment even with respect to *Stern* claims if parties consent); *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 793-94 (10th Cir. 2009) (bankruptcy courts have jurisdiction to determine nondischargeability, liquidate nondischargeable debt, and enter monetary judgment on nondischargeable debts). Further, venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## III. Procedural Background.

### A. Mr. Caldwell's Main Bankruptcy Case.

Mr. Caldwell filed for relief under Chapter 7 of the Bankruptcy Code on May 16, 2024 (the "Petition Date"), in the case captioned: *In re William Harrison Caldwell, II*, Case No. 24-12634 (Bankr. D. Colo.) (the "Main Bankruptcy Case"). He submitted a Voluntary Petition, Statement of Financial Affairs, Schedules A-H, and other related documents, in which he identified approximately $60,859.71 in assets, and $4,826,719.67 in liabilities. In his Schedules, he listed a debt owed to "Kesler Rust Law Offices" for "Collection – PLR, LLC and Cynthia Newby" in an "Unknown" amount.[6]

The Chapter 7 liquidation proceeded in a fairly typical fashion. The United States Trustee initially appointed Lynn Martinez as the interim Chapter 7 trustee (the "Trustee").[7] Mr. Caldwell attended his Section 341 meeting of creditors and was examined by the Trustee.[8] Joli A. Lofstedt was later appointed as successor trustee (the "Successor Trustee").[9] The Court entered Mr. Caldwell's discharge on September 10, 2024.[10] On August 15, 2025, the Successor Trustee filed a Report of No Distribution, certifying therein that she had "made a diligent inquiry into the financial affairs of [Mr. Caldwell] and the location of the property belonging to the estate; and that there is no property available for distribution from the estate over and above that exempted by law."[11] However, the Main Bankruptcy Case remains open.

### B. The Adversary Proceeding.

On January 7, 2025, the Plaintiffs filed their "Complaint for Determination of

---

5 Adversary Proceeding Docket Nos. 1, 14, 17, and 18.
6 Main Case Docket No. 1 and Ex. 30.
7 Main Case Docket No. 9.
8 Main Case Docket Entry dated August 26, 2024.
9 Main Case Docket No. 54
10 Main Case Docket No. 37.
11 Main Case Docket Entry dated August 15, 2025.

Dischargeability of Debt Under 11 U.S.C. § 523(a)" (the "Complaint").[12] In the Complaint, the Plaintiffs asserted that they had obtained a pre-petition judgment against Mr. Caldwell in the "Third District Court, Salt Lake County, State of Utah" (the "State Court") in the case captioned *PLR, L.L.C. and Cynthia Newby v. Bill Caldwell*, Civil No. 210904535-1 (Third District Ct., Salt Lake Cnty., Utah) (the "State Court Action") in the principal amount of $876,402.44. They further asserted that Mr. Caldwell is indebted to them in such amount, plus post-judgment interest at the rate of 18% per annum until paid in full, costs of collection, and attorneys fees, and that such debt should be deemed nondischargeable.

For their First Claim, the Plaintiffs contended that Mr. Caldwell's debt to them should be deemed nondischargeable as a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud" under Section 523(a)(2)(A). In their Second Claim, the Plaintiffs asserted that the debt should be determined to be nondischargeable as a debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . use of a statement in writing . . . (i) that is materially false; (ii) respecting [Mr. Caldwell's] financial condition; (iii) on which the [Plaintiffs] reasonably relied; and (iv) that [Mr. Caldwell] caused to be made or published with intent to deceive" under Section 523(a)(2)(B). In their Third Claim, the Plaintiffs contended that the debt should be deemed nondischargeable under Section 523(a)(4) as a debt for embezzlement. Finally, in their Fourth Claim, the Plaintiffs asserted that the alleged debt should be deemed nondischargeable under Section 523(a)(6) for "willful and malicious injury." The Plaintiffs also asserted that Mr. Caldwell is liable to them for costs and attorneys' fees pursuant to COLO. REV. STAT. § 18-4-405. On March 7, 2026, Mr. Caldwell filed "Defendant's Answer to Complaint for Determination of Dischargeability of Debt Under 11 U.S.C. § 523(a)" (the "Answer")[13] contesting the Complaint and disputing nondischargeability of debt.

The Court conducted a final pretrial conference in the Adversary Proceeding on April 22, 2025.[14] Thereafter, the Court issued a "Scheduling Order Under Fed. R. Civ. P. 16(b) and Fed. R. Bankr. P. 7026," establishing pre-trial deadlines and setting both a pre-trial conference and a trial on the Complaint and Answer.[15] Prior to the trial, the Plaintiffs and Mr. Caldwell submitted a "Joint Pretrial Statement" containing a set of 15 "Stipulated Facts" (the "Stipulated Facts").[16]

On March 11, 2026, the Court conducted a trial on the Complaint and Answer. At the trial, the Court heard testimony from: Mr. Newby; Mr. Rinehart; Mr. Newby; and Mr. Caldwell.[17] The Court admitted into evidence Plaintiffs' Exhibits 1-21, 24, 26, 28, and 30, and Defendant's Exhibits A-H.[18] At the conclusion of the evidence, the parties

---

12 Adversary Proceeding Docket No. 1.
13 Adversary Proceeding Docket No. 14.
14 Adversary Proceeding Docket No. 18.
15 Adversary Proceeding Docket No. 19.
16 Adversary Proceeding Docket No. 37 at 11-12.
17 Adversary Proceeding Docket No. 42.
18 *Id.*

requested that the Court allow them to present written closing arguments. The Court agreed and took the matter under advisement.[19] Subsequently, the Plaintiffs filed "Plaintiffs' Written Closing Argument" and Mr. Caldwell submitted "Defendant's Closing Argument."[20] Thereafter, the parties also submitted replies to each other's closing arguments.[21] Since that time, the Court has reviewed all the admitted exhibits, assessed the testimony of the witness, and considered the applicable law as well as the arguments submitted by the parties. The issues are ripe for determination.

## IV. <u>Factual Findings</u>.

Based upon the evidence presented at the trial, including the testimony, admitted exhibits, and Stipulated Facts, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052. To the extent that the Court's identification of the foregoing Procedural Background is factual in nature (that is, identifying what occurred in the Main Case and this Adversary Proceeding), the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.

### A. <u>The Newbys, the Project, and Formation of Esplanade</u>.

Mrs. Newby earned an undergraduate degree and a Masters in Science degree in nursing from the University of Utah in 2006. She has been a licensed nurse practitioner for over twenty years. She works with older patients in skilled nursing facilities, and loves working with that group of people.[22] Mrs. Newby is married to Mr. Newby.

Mr. Newby was awarded an associate's degree from Utah Valley State College in heating, ventilation, and air conditioning ("HVAC"), electronics, and controls. He holds a B100 general contractor's license and an HVAC contractor's license.[23] He is a builder by trade, mostly constructing single-family homes and some smaller multi-family apartment buildings of around 20-30 units. He has 20 years of experience in construction, and specializes in projects using Insulated Concrete Forms ("ICFs"). As Mr. Newby explained:

> Insulated concrete forms [ICFs] are [foam blocks] with the studs built into them and the support system for the rebar. Once you stack them like Legos, then they -- you pour the center of them with concrete. So it's essentially a concrete-reinforced building. And versus a regular stick-built building,

---

[19] *Id.*

[20] Adversary Proceeding Docket Nos. 51 and 50, respectively.

[21] Adversary Proceeding Docket Nos. 52 and 53.

[22] Trial Transcript (Adversary Proceeding Docket No. 44) at 177-78. Hereinafter, the Court will refer to particular portions of the trial testimony by reference to the Trial Transcript using the convention: "Tr. at __."

[23] Tr. at 22-23.

> they are fireproof, soundproof, [and] exceed the earthquake code by 18 times.[24]

Mr. Newby sees many advantages to using ICFs in construction.[25] ICFs provide double the insulation factor of lumber (or "stick-built") buildings. Buildings constructed with ICFs are more soundproof, fireproof, and exceed the earthquake code by 18 times. They are less labor-intensive to construct and thus less expensive with respect to labor.[26] Mr. Newby uses ICFs in his projects and was involved in the construction of a two-level, 32-unit apartment building in Salt Lake City.[27]

Sometime in the 1990s, the Newbys purchased a residence in downtown Salt Lake City, Utah, located on West Learned Avenue and 1000 West. Years later, they approached the city about major remodeling. Unexpectedly, and for reasons the Court does not understand, the Newbys were informed by Salt Lake City that if they wanted to obtain a permit to remodel, they would need to build a five-story building on a quarter acre portion of their property. To that end, the Newbys tried to purchase homes around them so that they would not be "built out" of the area. Between 2000 to 2010, they purchased 10 or 11 homes on both sides of West Learned Avenue. The Newbys' original goal in doing so was to keep the homes as rentals from which they could earn passive income as part of their retirement plan. But Salt Lake City would not give them permits to remodel any of the homes and exerted pressure upon them to replace the single-family residences with five-story or taller residential properties.[28]

Eventually, the Newbys relinquished the idea of remodeling and started to look at developing a project consistent with the vision espoused by Salt Lake City. They hired MJS Architects to develop a plan for building on the south side of the street (previously identified as the "Project"). After two-and-a-half years, Mr. Newby received the required permits.[29] The plan for the Project provided for the construction of two 200-unit apartment buildings, in two phases. An artist's rendition of phase one of the Project was admitted as Exhibit C.[30] The Newbys called the Project the "Esplanade Apartments."

In connection with planning the Project, Mr. Newby (acting hand-in-hand with MJS Architects) performed a financial analysis of the projected cost of construction and profit potential. The Newbys did not have cash to put into the Project. Mr. Newby hoped that, because he planned to do much of the work himself, his contribution of "sweat equity" would make it possible for him to complete the Project with some additional financing. Unfortunately, because Mr. Newby did not have experience with a project of this magnitude, the financing institutions Mr. Newby spoke with were not

---

24 Tr. at 23-24.
25 Tr. at 24.
26 *Id*.
27 Tr. at 23.
28 Tr. at 25-26.
29 Tr. at 25-26 and 178-79.
30 Tr. at 27.

willing to fund the Project unless he partnered with a company that had more experience in building large apartment buildings.[31]

The Newbys formed Esplanade as a limited liability company to complete the Project. Because Mrs. Newby had a better credit rating at the time of formation and was the principal bread-winner, Mrs. Newby (rather than Mr. Newby) was named as the sole member and owner of Esplanade. Since Mrs. Newby, who worked long hours as a health professional, did not have time to run the Project, and since Mr. Newby had construction and general contractor skills, he acted as the sole manager of Esplanade. As manager, Mr. Newby facilitated the Project as the "go-to person" on site. Mr. Newby planned to do much of the construction himself. He kept Mrs. Newby apprised of matters related to the Project by means of verbal communications.[32]

Mr. Newby initially approached an entity named "Actium" to finance the Project. Actium did provide some bridge funding (the "Actium Loan").[33] At another point, he approached a company called "Broadmark", which declined. Ultimately, an entity known as "Miller & Bates" ("Miller") agreed to provide additional financing (the "Miller Loan"). Paulsen Construction ("Paulsen"), a company with significant experience in building apartment buildings similar to the Project, declined to partner with Esplanade to work on the Project because there was not enough money in it for them to make the profit they wanted. However, Paulsen went through the figures with Mr. Newby and gave him a pro forma that included a detailed listing of what the projected costs of the Project would likely be (the "Paulsen Estimate").[34] The Newbys explored other options, but in so doing, exhausted their resources and found themselves in a situation where they were going to have to sell the Project. It was at this point that they met Bob Jones.

## B. <u>The Bob Jones Debacle and PLR's Ownership Interest in Esplanade</u>.

Somehow, the Newbys "came across this guy by the name of Bob Jones [who] convinced us that he had the wherewithal to supervise this job [the Project]."[35] Bob Jones ("Mr. Jones") took Mr. Newby "around town" to different "big projects" he had. Mr. Jones hired Mr. Newby to do some construction work. Mr. Jones got Mr. Newby to the point where he was "thinking bigger," and convinced the Newbys that he had the wherewithal to supervise and complete the Project. They reached a handshake deal. Afterward, the Newbys leveraged everything they had for purposes of funding the Project. They gave Mr. Jones control of the Newbys' funds — about $3.5 million. Once Mr. Jones had the cash in hand, he "took the money," disappeared, and left the Newbys with nothing but the bills.[36]

---

[31] Tr. at 27-30.

[32] Tr. at 30-31 and 45-46.

[33] There was little testimony on this point. However, as discussed later in this Order, on July 8, 2020, a loan in favor of Actium was paid off by CIL in connection with the Broadmark Agreement after CIL's acquisition of the membership interests of Esplanade pursuant to the Esplanade PSA. So, the Court infers that Actium entered into a loan agreement with Esplanade at some time prior to April 2020.

[34] Tr. at 31, 50-51, and 84.

[35] Tr. at 31-32.

[36] Tr. at 31-32; 180-81.

After their experience with Bob Jones, the Newbys engaged Mr. Rinehart as their attorney.[37] Mr. Rinehart received his Bachelor of Science degree in chemical engineering from Brigham Young University. He earned a Masters in Business Administration in 1979 from the University of Houston and his Juris Doctorate in 1982. Mr. Rinehart has practiced law for 44 years, specializing in corporate and real estate transactions.[38]

With Mr. Rinehart's help, the Newbys were able to recover about $250,000 of their $3.5 million from Mr. Jones, but the Newbys lost most of the real properties they had owned prior to their involvement with Mr. Jones.[39] Still, the Newbys became friends with Mr. Rinehart, and they decided to work together. To that end, Mr. Rinehart formed PLR and became its sole manager, though not its owner. In exchange for Mr. Rinehart's providing legal work for Esplanade, PLR obtained a one-third membership interest in Esplanade from Mrs. Newby. No membership certificates were issued. However, PLR obtained its ownership interest in Esplanade sometime between 2016 and 2018 by virtue of an Operating Agreement.[40]

Prior to the time that PLR obtained its ownership interest in Esplanade, Esplanade had entered into the Miller Loan which was a six-month bridge loan to pay development expenses for the Project. The Miller Loan was secured by a deed of trust on five houses located on the site where the Project was to be built and became due in 2019.[41] The Newbys guaranteed repayment of the Miller Loan.[42] Esplanade hoped to get takeout financing to pay Miller and to partner with another entity to obtain a true construction loan in the neighborhood of $18 to $22 million so that it could complete the Project.[43] Mr. Newby testified that the appeal of the Project was that it involved a large quantity of land in a good location in an opportunity zone. It was permitted and shovel-ready. So long as Mr. Newby remained involved, the Project could move forward under the existing permit because it was in Mr. Newby's name. Otherwise, anyone else who wished to move forward would have to start the permitting process anew.[44] The Newbys believed that the economic benefits of the Project would appeal to a number of prospective buyers.

Unfortunately, prospective partners, investors, and buyers did not seem to have as rosy a view of the Project as the owners of Esplanade. Between the time that the Newbys conceived of the Project and the time the Miller Loan became due, the market had substantially changed. Costs of ICFs and other building materials had increased substantially. Further, since not many builders used or had experience building with

37 Tr. at 60 and 65.
38 Tr. at 57-58.
39 Tr. at 32-33.
40 Tr. at 60-62.
41 Tr. at 64-65, 80,
42 Tr. at 41.
43 Tr. at 66 and 67.
44 Tr. at 33-34.

ICFs, few builders could take over the Project in its then-current form without either involving Mr. Newby or finding another contractor with similar expertise.[45]

By 2020, the real property underlying the Project was valued at about $4 million; but the property was encumbered the Miller Loan and the Actium Loan.[46] Though Mr. Newby met with various potential investors and lenders, and a loan broker named Dylan Nelson ("Mr. Nelson"), he was unable to qualify for a new construction loan due to poor credit and a lack of equity, and thus Esplanade lacked the wherewithal to pay the Miller Loan.[47] With the debt due, Miller began exerting pressure on Esplanade to sell the real property underlying the Project. Though Miller granted Esplanade several extensions of time to give Esplanade time to try to sell, Miller eventually refused further extensions and informed Esplanade that it intended to foreclose on the real property supporting the Project.[48] On April 28, 2020, Miller put Esplanade on notice of a foreclosure deadline.[49] A trustee sale was scheduled for the end of June 2020.[50] Esplanade and the Newbys were desperate and about to lose any value in the Project.

## C. <u>Sale of Esplanade to Caldwell Investments, LLC</u>.

Around the time that Esplanade received notice that Miller intended to foreclose on the real property supporting the Project, Mr. Nelson introduced Mr. Newby to Mr. Caldwell.[51] Mr. Caldwell represented that he had been involved in developing apartment projects in Ogden, Utah, and in hundreds of other real estate developments.[52] He provided Mr. Rinehart a copy of his resume (the "Caldwell Resume").[53] The Caldwell Resume includes a Paradigm Real Estate logo and lists Mr. Caldwell's various real estate projects and real-estate related credentials.[54] No evidence was presented at trial proving that the Caldwell Resume was false or inaccurate.

Mr. Caldwell indicated that he was interested in working on the Project with Esplanade and that he might be able to use Mr. Newby's excavation and building skills to do so, particularly since the building was designed as an ICF building and there were not a lot of ICF contractors around who could take on the Project. Indeed, because Mr.

---

45 Tr. at 37, 50-51, 248-49.
46 Tr. at 50-51, 60-67, and 160-61.
47 Tr. at 126-28.
48 Tr. at 32, 50-51, 65-66, 128, 149.
49 Tr. at 128.
50 Tr. at 242.
51 Tr. at 125-26.
52 Tr. at 34, 36, 68, 70, 119, 156-57, and 188. Some such projects are also listed in Exhibit 11, which was admitted into evidence, but it is not clear when this document came into the Plaintiffs' possession or whether they relied upon it. Tr. at 34-35, 70-71.
53 Ex. 7.
54 Mr. Rinehart testified that he reviewed the Caldwell Resume and relied upon it in connection with making the decision to enter into the Esplanade PSA. Tr. at 69-70. However, Mr. Newby did not see the Caldwell Resume prior to entering into the Esplanade PSA and did not believe it "was presented to [him] originally." Tr. at 35 and 53. There was no evidence that Mrs. Newby ever saw or relied on the Caldwell Resume.

Newby was the one with all the experience with ICF construction, which, Mr. Caldwell explained "is a very complicated construction project or concept and had never been done before in this size and state inside of the State of Utah," he needed Mr. Newby to make the Project viable. Mr. Newby viewed the potential of his being employed in connection with the Project as a "carrot" to him.[55] Eventually, Mr. Rinehart became involved, and he and Mr. Caldwell began to have conversations about Mr. Caldwell's purchase of the equity in Esplanade from the Newbys and PLR.[56]

Possibly around May 2020 (a month before the scheduled foreclosure related to the Miller Loan), Mr. Rinehart came into possession of certain financial information regarding Mr. Caldwell and/or his entities:

- A "Personal Financial Statement" for Mr. Caldwell submitted as part of a loan application to U.S. Bank N.A. dated April 29, 2020 (the "Personal Financial Statement);[57]

- A Profit and Loss Statement for Paradigm Real Estate Ogden LLC ("Paradigm") for the period from January 1 to November 30, 2019 (the "Paradigm P&L");[58]

- A Balance Sheet for CIL, dated December 2, 2019 (the "CIL Balance Sheet");[59]

- A Profit and Loss Statement for CIL, for the period January 1 to December 31, 2019 (the "CIL P&L").[60]

The Court refers to the foregoing documents together as the "Financial Documents."

How the Plaintiffs came to be in possession of the Financial Documents remains a mystery — even after trial. Mr. Caldwell testified, rather emphatically and convincingly, that neither the Newbys nor Mr. Rinehart ever requested any financial information. Further, Mr. Caldwell swore that he did not provide any of the Financial Documents to the Newbys or Mr. Rinehart.[61]

Mrs. Newby confirmed that she never met or spoke with Mr. Caldwell.[62] With respect to the Financial Documents, Mrs. Newby testified:

> Q. What kind of [financial] documents did you look at?

55 Tr. at 36-37 and 246-47.
56 Tr. at 36-38, 68, 240-41.
57 Ex. 20.
58 Ex. 18.
59 Ex. 21.
60 Ex. 19.
61 Tr. at 259 and 283.
62 Tr. at 210.

> A. I can't --- I can't really tell you right now, but Mark was over --- looked over finances and then he was our counsel, so he counseled us on what he --- this guy had.
>
> Q. Mr. Rinehart mentioned Exhibit 20 [Personal Financial Statement] here in front of you, Ms. Newby, a personal financial statement in April 2020. Was this one of the documents you relied upon?
>
> A. I don't remember seeing this, but it --- it makes sense.[63]

Ultimately, Mrs. Newby was unable to recall any of the Financial Documents, how they were received, or if she relied on them.[64]

Mr. Newby testified somewhat similarly: "if there's any financial statements they would have come through Mark [Rinehart]"; "I can't stress it enough, but we didn't do anything unless it came through Mark"; and "I handle all the construction side of things via information, knowledge base, experience, that type of thing. But the financial documentation, I've been bitten once. I'm not doing it again."[65] When invited by his counsel to confirm that he relied on the Financial Documents, Mr. Newby responded: "I have seen them *since all this has gone south, yes.*"[66]

Mr. Rinehart initially testified that he had received the Financial Documents from Mr. Caldwell. But under cross-examination, he walked his testimony back significantly and swore:

> Q. Is it possible, Mr. Rinehart, that my client never gave you these financials? You got them from a third party, if you ever got them?
>
> A. It's possible because I don't remember how I got them.
>
> Q. And is it more than just possible that you didn't receive the financial statements because you never ask him [Mr. Caldwell] for the financial statements?
>
> A. Not remembering, I'd have to say yes, it's possible.[67]

In the end, the Plaintiffs did not establish that Mr. Caldwell gave any of the Financial Documents to any of them. Their extremely vague and even contradictory testimony bolsters Mr. Caldwell's denial of having provided the Financial Documents to

---

63 Tr. at 189-90.
64 Tr. at 190 and 198-201.
65 Tr. at 294.
66 Tr. at 293 (emphasis added).
67 Tr. at 147.

the Plaintiffs and leaves the Court guessing as to whether the Financial Documents were given to the Plaintiffs by a third party without Mr. Caldwell's knowledge.

In any event, what do the Financial Documents show? The Personal Financial Statement, which appears to be a form supplied by US Bank to be used in connection with a loan application, is signed by Mr. Caldwell and dated April 29, 2020. In the Personal Financial Statement, Mr. Caldwell stated that his salary was $240,000 and that he had net real estate income of $350,000. He claimed that he had $180,000 in "cash, savings, and certificates" at Wells Fargo Bank N.A., and stated that CIL (an entity owned by Mr. Caldwell) had $200,000 in accounts receivable. Mr. Caldwell further noted in the Personal Financial Statement that he owned a residence at "5545 S. 122 E., Ogden" with a current market value of $720,000 and a mortgage balance of $430,000. He stated he had a $30,000 balance due on miscellaneous credit cards. With respect to his assets and liabilities, Mr. Caldwell listed the following:

Some of the values in this summary auto populate from the above schedules.

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash (Schedule 1) | 180,000 | Installments, Credit Lines and Notes (Schedule 8) | 0 |
| Retirement Accounts (Schedule 2) | 0 | Credit Accounts and Bills Due (Schedule 9) | 30,000 |
| Securities Owned (Schedule 3) | 0 | Insurance Loans (Schedule 4) | 0 |
| Life Insurance Cash Value (Schedule 4) | 40,000 | Mortgage on Home(s) (Schedule 6) | 430,000 |
| Contracts held by you (Schedule 5) | 200,000 | Mortgage on Other Real Estate (from PFS Schedule for Investment Property) | 32,093,961 |
| Homes for your own use (Schedule 6) | 720,000 | Profit Sharing and Pension Loans (Schedule 7) | 0 |
| Investment Real Estate (from PFS Schedule for Investment Property) | 65,124,070 | Taxes | 0 |
| Profit Sharing & Pension (Schedule 7) | 0 | Other Liabilities (Describe) | |
| Value of Your Ownership Interest in Business | 7,200,000 | | |
| Automobiles | 50,000 | | |
| Personal Property | 250,000 | | |
| Other Assets (Describe) | | | |
| | | Total $ | 32,553,961 |
| Total $ | 73,764,070 | (Total Assets Less Total Liabilities) Net Worth $ | 41210109 |

And, Mr. Caldwell certified as follows on the Personal Financial Statement:

I certify that the information provided in this statement is complete, true and correct as of the date signed. So long as I owe any sums to the Bank, I agreed to give the Bank prompt written notice of any material change in my financial condition, and upon request, agree to provide the Bank with an updated personal financial statement. The Bank is authorized to retain this personal financial statement whether or not credit is approved and is further authorized to verify my credit and employment history or any other information in this statement. If credit is granted, the Bank is authorized to obtain a credit bureau report periodically. This application does not obligate the Bank to provide credit.

Certain statements in the Personal Financial Statement were not accurate. Mr. Caldwell, personally, did not have $180,000 in cash; the funds were owned by his entity: CIL.[68] Mr. Caldwell's 2019 tax return shows that he did not have wages, salaries, or commissions in 2019, and shows adjusted gross income of - $2,525,757 as a result of certain business losses.[69] Mr. Caldwell did not personally own the "Investment Real Estate" listed on the Personal Financial Statement; instead, he formed single-purpose

68 Tr. at 226-27.
69 Ex. 9 at 5-7.

limited liability companies to hold the properties so that he could bring in investors into his real estate projects who would then own some portion of the limited liability companies.[70] The value of the real estate listed in the Personal Financial Statement was based solely on Mr. Caldwell's opinion of value.[71]

The "Paradigm P&L pertains to a limited liability company owned by Mr. Caldwell.[72] The Paradigm P&L showed net income of $557,117.22 for the period January 1 through November 30, 2019. The CIL Balance Sheet, which is dated December 2, 2019, showed:

BORROWER **Balance Sheet**

BORROWER Name: Caldwell Investments LLC

| Balance Sheet | | As of Date: 12/2/2019 | |
|---|---|---|---|
| **CURRENT ASSETS** | | **CURRENT LIABILITIES** | |
| Cash | 200,000.00 | Accounts payable | 0 |
| Marketable Securities | | Accrued wages | 0 |
| Inventories | 200,000.00 | Accrued compensation | 0 |
| Accounts receivable | 5,000,000.00 | Income taxes payable | 0 |
| Pre-paid expenses | | Other Current Liabilities | 0 |
| Other Current Assets | | | |
| **Total** | 5,400,000.00 | **Total** | 0 |
| **FIXED ASSETS** | | **LONG-TERM LIABILITIES** | |
| Real Estate (Provide detail in the Schedule of Real Estate) | 63,696,062.73 | Mortgage payable | 37,301,995.17 |
| | | Other Long-Term Liabilities | 0 |
| Stock and Bonds Not Used on Exchanges; Interest in Partnerships and LLCs | 1,000,000,00 | | |
| Less accumulated depreciation (Negative Value) | -3,000,000.00 | | |
| Other Fixed Assets | | | |
| **Total** | 61,696,062.73 | **Total** | 37,301,995.17 |
| **OTHER ASSETS** | | **OWNER'S EQUITY (NET WORTH)** | 29,794,067.56 |
| Other Assets | | | |
| **Total** | 67,096,062.73 | **Total** | 67,096,062.73 |

| Disclosure |
|---|
| Are any of the above listed assets or liabilities held in Joint Tenancy or Tenancy in Common, or in a Trust? ☐ Yes ■ No If yes, please provide details: |

It is signed by "William H. Calewell," an obvious typographical error. The CIL P&L, which is for the period January 1 to December 31, 2019, showed total income in the amount of $11,574,329.26, total expenses of $9,638,164.53, and net income of $1,936,164.73.

In any event, whether based on the Financial Documents or oral conversations, the Newbys and Mr. Rinehart believed that Mr. Caldwell had substantial net worth.[73] Indeed, Mr. Rinehart understood that Mr. Caldwell, either personally or through CIL,

---

70 Tr. at 217-18.
71 Tr. at 226.
72 Tr. at 72; Ex. 18.
73 Tr. at 77-78, 146, and 157.

owned $63 million in real estate and had a net worth of $30 million. He did not understand that the real estate was held by other entities owned by Mr. Caldwell.[74]

After further discussions with Mr. Rinehart and Mr. Newby, Mr. Caldwell agreed to become an "angel investor" in the Project. Mr. Caldwell did so because he believed the Project was a good one. He had reviewed the detailed Paulsen Budget[75] which he understood to be the "the fully vetted construction cost for what was necessary to be able to construct the [P]roject" — a cost of around $20,454,075.61.[76] Indeed, Paulsen had "agreed to be the contractor underneath the Broadmark loan and [to be] bound by Broadmark as well." He had "multiple conversations with Paulsen . . . before we closed in regards to that."[77] Mr. Caldwell obtained an appraisal of the value of the Project after completion[78] and vetted loan costs.[79] He also performed his own financial analysis of the Project. In Mr. Caldwell's view:

> Insulated concrete forms is an exceptional construction method. The buildings will last a much longer period of time. They're bug proof, they're waterproof, they're fireproof, they have incredible R factor ratings which make them -- with this type of construction, we like to say that you can heat it with a match, you can cool it with an ice cube. So they're very energy efficient, which is a huge benefit. But they're -- nobody had ever tried to do something of this nature because it's so darn expensive.[80]

Despite the expense, and because he believed in the Project, Mr. Caldwell engaged in efforts to secure additional funding with the intent of partnering with Esplanade on the Project. To that end, he approached Broadmark (the same entity from which Mr. Newby had previously sought financing, to no avail), which engaged in extensive due diligence and went through his financials.[81] Together, Mr. Caldwell and Broadmark reached a funding agreement (the "Broadmark Agreement") through which Mr. Caldwell "secured enough funding to be able to accomplish the construction based off of the [Paulsen Budget]." Under the Broadmark Agreement, Mr. Caldwell, through CIL, agreed to take out a $17 million loan to fund the Project (the "Broadmark Loan"). In order to do so, Mr. Caldwell had to bring about $591,000 of his own funds to the table, and to personally guarantee the Broadmark Loan.[82] The Broadmark Loan did not include the "PACE

---

74 Tr. at 77.
75 Ex. F.
76 Tr. at 244; Ex. F at 4.
77 Tr. at 244 and 248.
78 Ex. D.
79 Tr. at 245-46.
80 Tr. at 260-61.
81 Tr. at 242-44.
82 Tr. at 242-44.

funding" that Mr. Caldwell "also had to secure in order to complete the capital stack," which was more than an additional $5 million.[83]

Though Miller was poised to foreclose on Esplanade's properties, Mr. Caldwell was able to push them back by providing proof that he had funding coming in imminently.[84] Ultimately, on June 29, 2020, Mrs. Newby, PLR, and CIL, an entity owned by Mr. Caldwell, entered into an "LLC Purchase and Sale Agreement" (the "Esplanade PSA") wherein CIL, as Purchaser, purchased Mrs. Newby's two-thirds interest in Esplanade and PLR's one-third interest in Esplanade, from Mrs. Newby and PLR as Sellers.[85] Mr. Rinehart prepared the Esplanade PSA.[86]

Section 1.3 of the Esplanade PSA provided:

> 1.3 Purchase Price. The total purchase price for the Interests is Six Hundred Thousand Dollars ($600,000.00) (the "Purchase Price"), payable $400,000 to Cynthia Newby as owner of the Newby Interest and $200,000 to PLR as owner of the PLR Interest. At the Closing, Purchaser shall pay the Purchase Price to Sellers in the form of two separate promissory notes (the "Notes"). The principal amount of Cynthia Newby's Note will be $400,000. The principal amount of PLR's Note will be $200,000. Each Note will bear interest at the rate of five percent (5%) per annum, increasing to eighteen percent (18%) if a default occurs: The maturity date of the Notes will be three months after the Closing Date. The Notes will be in substantially the form of Exhibit A attached. The Notes will be secured by a single, third position Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "Deed of Trust") in substantially the form of Exhibit B attached. At the Closing, the Parties will take the actions and execute and deliver to each other the documents and other items that are described below.[87]

Section 1.6 of the Esplanade PSA stated:

> Actions at the Closing. At the Closing, the Parties will take the following actions and cause the following to occur:
>
> (a) Sellers will cause Rodney Newby to resign as the sole manager of the Company;
>
> (b) Purchaser will purchase the Phase I Parcel from Miller Bates, and will cause the Miller Bates Loan to be

---

83 Mr. Caldwell explained that "PACE funding" is government-backed funding for energy beneficial projects. Tr. at 254-55.

84 Tr. at 247.

85 Ex. 10; Compl. ¶ 7; Answer ¶ 7.

86 Tr. at 78 -79.

87 Ex. 10 at 2-3.

> paid in full, resulting in termination of Cynthia Newby's and Rodney Newby's personal guaranties of the Miller Loan. Purchaser will be responsible for negotiating and reaching agreement with Miller Bates to accomplish the results described in this paragraph;
>
> (c) Purchaser will pay off the Actium Loan in full, resulting in termination of Cynthia Newby's and Rodney Newby's personal guaranties of the Actium Loan. Purchaser will be responsible for negotiating and reaching agreement with Actium to accomplish the results described in this paragraph;
>
> (d) Purchaser will execute and deliver the Notes and the Deed of Trust to Sellers, and the Deed of Trust will be recorded at Purchaser's expense as a third position encumbrance of the Parcels in the real estate records of Salt Lake County, Utah.
>
> (e) Cynthia Newby will deliver a Bill of Sale that assigns all of the Newby Interest to Purchaser. Cynthia Newby's Bill of Sale will be in substantially the form attached as Exhibit C; and
>
> (f) PLR will deliver a Bill of Sale that assigns all of the PLR Interest to Purchaser. PLR's Bill of Sale will be in substantially the form attached as Exhibit C.
>
> (g) The Parties will take such other actions and will execute and deliver such other documents and agreements as are required to consummate the transactions described above and to carry out the purposes and intent of this Agreement.[88]

Section 4.5 of the Esplanade PSA provided:

> 4.5 <u>Financial Condition.</u> Purchaser has not filed any voluntary petition in bankruptcy or been adjudicated as bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any Federal bankruptcy act, insolvency or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. Purchaser has all funds necessary to enable it to perform

[88] Ex. 10 at 3-4.

> under this Agreement and the other Transaction Documents to which it is a party.

And, under Sections 5.1 and 5.2 of the Esplanade PSA, the parties agreed:

> 5.1 No Other Representations or Warranties. Except as specifically and expressly provided herein, Sellers make no representations or warranties regarding the Interests, the Company, the Parcels, the status of the Company's application for a building permit, the economic feasibility or likelihood of construction of the Project, the likelihood or the ability of the Company to obtain a HUD approval or a HUD guaranteed loan, compliance by the Company with applicable laws, environmental matters, payment of taxes, legal proceedings filed or threatened, or any other matter involving or relating to the Company or the Parcels. Sellers have made available to Purchaser all information in Sellers' possession relating to the Company, have made the Company's manager, Rodney Newby, available to Purchaser with directions to answer any and all questions Purchaser may have and to provide such documents and information as Purchaser may request. Purchaser is and shall be fully responsible for conducting all due diligence review of the Company and the Project as Purchaser deems necessary.
>
> 5.2 As Is, Where Is. Purchaser acknowledges and agrees that it is purchasing the Interests "where is, as is" without representations or warranties of any kind except as may have been expressly stated herein. Purchaser acknowledges and agrees that the Purchase Price is less than it would otherwise be if Sellers were not selling the Interests in "as is/where is" condition. Purchaser agrees to assume all risk of loss associated with ownership of the Interests and is not relying in any way on representations or warranties made by Sellers except as expressly stated herein.

The Esplanade PSA also contained a standard integration clause (Section 6.5) which stated: "This Agreement and any other agreement contemplated herein constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter." Accordingly, Mrs. Newby and PLR effectively disclaimed any reliance on the "representations and warranties" in the Financial Documents.

Mrs. Newby signed the Esplanade PSA in her individual capacity. Mr. Rinehart signed the Esplanade PSA in his capacity as manager of PLR. Mr. Caldwell signed the Esplanade PSA in his capacity as manager of CIL.[89] Mr. Newby was present during the signing of the Esplanade PSA but, as a non-member, did not sign.[90] The Esplanade PSA was structured as an equity transaction instead of an asset transaction because the permits for the Project had been issued to Esplanade and could not be transferred if Esplanade's properties, rather than its equity, were sold.[91]

Neither Mr. Newby, Mrs. Newby, nor Mr. Rinehart reviewed any financial documents beyond the Financial Documents, if in fact they reviewed those documents, prior to entering into the Esplanade PSA. None of the foregoing individuals conducted any additional due diligence, such as reviewing tax returns for Mr. Caldwell or his entities; bank statements for Mr. Caldwell or his entities; or profit and loss statements, balance sheets or other corporate documents for any of Mr. Caldwell's corporate entities (aside, possibly, from the Financial Documents); nor did they communicate with any third parties to verify the accuracy of any of the representations Mr. Caldwell made in any document or orally.[92] Mr. Rinehart assumed the statements in the Personal Financial Statement were signed under penalty of perjury (they were not) and submitted to US Bank and thus "assumed they were true."[93]

Sometime after the parties entered into the Esplanade PSA, a loan broker named Jackson Jones advised the Newbys and Mr. Rinehart that he had a cash buyer for Esplanade's properties. According to Mr. Rinehart, the cash buyer would have "paid for everything in cash" and cashed Mrs. Newby and PLR out completely, but they passed on the deal because Esplanade was under contract with Mr. Caldwell.[94] No letter of intent or other documentation regarding the cash buyer was presented to the Court. As Mr. Rinehart explained it:

> Jackson Jones was our representation, our loan broker. And he told me on the phone. He said, "Too bad because I had a cash buyer for you." And I said, "Yeah, but we can't – we can't accept it." I don't – I didn't think it mattered. I mean, we passed – at that time, we had every confidence that our notes would be paid.[95]

Instead, the Plaintiffs contracted with CIL. In the Esplanade PSA, CIL, as Maker, was supposed to execute two Secured Promissory Notes: one payable to Mrs. Newby as Holder in the amount of $400,000 (the "Newby Note"), and another payable to PLR as Holder in the amount of $200,000 (the "PLR Note") (together, the "Esplanade Sale

---

89 Ex. 10 at 11; Tr. at 38-39.
90 Tr. at 39.
91 Tr at 85-86.
92 Tr. at 53-54, 144-146, 201-02, and 283-85.
93 Tr. at 120, 146-47, 172.
94 Tr. at 151-52.
95 Tr. at 152-53. The Court was presented with no details related to the cash buyer, such as the identity of the prospective buyer or the proposed terms of the deal.

Notes").[96] However, inexplicably, the Esplanade Sale Notes were issued by Esplanade — not CIL. The Esplanade Sale Notes were both executed on June 29, 2020, and all amounts owed thereunder were due three months after execution. The Esplanade Sale Notes were secured *pari passu* by a "Deed of Trust, Assignment of Rents, Security Agreement Fixture Filing" dated June 26, 2020, that encumbered real property owned by Esplanade, and were recorded in the real property records of Salt Lake City, Utah.[97]

## D. **<u>The Broadmark Agreement, Failure of the Project, and the Decline of Mr. Caldwell's Financial Position</u>.**

Not long after the sale of all the membership interests in Esplanade was completed, Esplanade (through Mr. Caldwell, as its new owner) entered into an agreement with Broadmark so that Esplanade could obtain financing to complete the Project (the "Broadmark Agreement"). In order for Esplanade to qualify for the financing, Mrs. Newby and PLR had to agree to subordinate their secured claims to Broadmark's secured claim. They agreed to do so.[98] Given the timing sequence, the Plaintiffs could not have known whether the Broadmark Agreement would close when they entered into the Esplanade PSA.

The settlement statement issued after consummation of the Broadmark Agreement, dated July 8, 2020, shows that Broadmark loaned $17,351,206.00 to Esplanade. From that amount, loan charges, including a broker fee, title insurance, and other fees were deducted. Funds in the amount of $13,578,183.00 were impounded as a construction holdback, and a $1,040,000 miscellaneous charge for Broadmark was paid. Importantly, $1,393,757.47 was used to pay off the Miller Loan, and $661,126.15 was used to payoff of the Actium Loan.[99] Broadmark did not advance any further funds.[100] Esplanade, as borrower, put down $591,769.62 on the Broadmark Loan.[101] Esplanade's contribution was funded by Mr. Caldwell.[102]

The debt owed by Esplanade to Miller in the amount of $1,393,757.47, and the debt owed to Actium in the amount of $661,126.15 were secured by Esplanade's real estate and guaranteed by the Newbys. It was important to Mr. Newby that Miller, in particular, was paid off.[103] Mr. Newby and Mr. Rinehart both understood that Mr. Caldwell did not have sufficient cash on hand on the closing date of the Esplanade PSA to pay the Esplanade Sale Notes and that he needed to obtain takeout financing in order to satisfy the obligation under the Esplanade Sale Notes.[104] However, despite the fact that Mr. Rinehart drafted the Esplanade PSA, which called for the execution of the Esplanade Sale Notes, and despite knowing that Mr. Caldwell did not have cash on

96 Tr. at 16. *See also* Exs. 15-17.
97 Ex. 15-17 at 1 ¶ D.
98 Tr. at 79-80. As a result, Ms. Newby and PLR ended up with unsecured promissory notes. *Id.*
99 Ex. 28
100 Tr. at 150.
101 Ex. 28.
102 Tr. at 236, 244.
103 Tr. at 40-41; Ex. 28.
104 Tr. at 66, 79-80.

hand at closing to pay Mrs. Newby and PLR, Mr. Rinehart claims not to have understood that Mr. Newby was getting a loan to finance the purchase under the Esplanade PSA. Mr. Rinehart testified he did not "remember being concerned with where the money was coming from as much that [Mr. Caldwell] had the money based on the previous financial statements."[105]

Unfortunately, it was not long after Mr. Caldwell closed on the Broadmark Loan that he learned that Paulsen would not honor the Paulsen Budget because the subcontractors were unwilling to move forward without going through the bid process again.[106] At this time, the construction industry was, as Mr. Caldwell described it, "bent over a barrel."[107] Much of the country had been shut down as a result of the Covid 19 pandemic, and there had been a fire in Canada that had wiped out a lot of wood and thereby led to increased lumber costs. Everything from transportation to construction materials had become significantly more expensive.[108] So, Mr. Caldwell and Mr. Newby sought rebids on the Project and learned that costs had increased to approximately $26 million.[109]

When Mr. Caldwell learned of the increased costs for the Project, he approached Broadmark about renegotiating the loan. "Not only did [Broadmark] not renegotiate the loan, they also said they would not take PACE funding any further."[110] Effectively, Broadmark put the brakes on the Project and said that the Project could not move forward until Mr. Caldwell could engage new contractors.[111] Because it would have taken many years to obtain permits to use a different type of construction, such as lumber, Mr. Caldwell did not consider changing construction forms. Indeed, Broadmark did not want him to try to do so. But in the meantime, interest on the loan obtained pursuant to the Broadmark Agreement was accruing to Mr. Caldwell's detriment.[112]

Ultimately, in December 2020, Broadmark filed suit against Mr. Caldwell, alleging breach of contract.[113] Mr. Caldwell countersued Broadmark. Later, the parties reached a settlement agreement. Mr. Caldwell testified that the Project was still viable up until the time that he signed the settlement agreement. However, the lawsuit cost Mr. Caldwell approximately $50,000.[114]

---

105 Tr. at 79-80.

106 Tr. at 250 and 263.

107 Tr. at 250.

108 Tr. at 250-51.

109 The Paulsen Budget estimated costs of $20,454,075.61. *See* Ex. F. Mr. Newby, Mr. Rinehart, and Mr. Caldwell all testified that they used the Paulsen Budget in their evaluation of the value of the Project prior to the Esplanade PSA. Tr. at 31, 84, and 244. At one point in the trial, Mr. Caldwell testified that after the parties entered into the Esplanade PSA the costs of the Project went up by $6 million. Tr. at 251-53. A rebid from Mortar and Beam Construction showed that costs would be approximately $26 million. Tr. at 278-79 and Ex. G.

110 Tr. at 253 and 253-55.

111 Tr. at 255.

112 Tr. at 255-56.

113 Tr. at 257 and 267-68. Broadmark's only claim was for breach of contract. It did not sue Mr. Caldwell for fraud or false pretenses in connection with the Broadmark Agreement. Tr. at 267-68.

114 Tr. at 257.

Mr. Caldwell was facing other financial challenges at this time. Per Mr. Caldwell, in June 2020, when he entered into the Esplanade PSA, Mr. Caldwell had been in a "very good financial position" with a "significant amount of assets." Around the same time that Mr. Caldwell entered into the Broadmark Agreement, he was engaging in other transactions, including purchasing a home and a ranch, as well as two subdivisions, all in Colorado. But, the subdivisions failed. Further, the lenders for these transactions, scared of what was happening to the market as a result of the pandemic, backed out. Mr. Caldwell lost his earnest money and the due diligence funding he had put into both projects. He lost a significant amount of his cash.[115] In addition, the company that held the debt on 28 properties on which Mr. Caldwell had taken out bridge loans called the debt in, even though such debt was not in default, and Mr. Caldwell had to "fire sell" all of those properties.[116] The entire real estate industry was affected because lending was not working.[117]

## E. <u>The Forbearance Agreements</u>.

The Esplanade Sale Notes matured on September 29, 2020 — just as Mr. Caldwell's financial picture was changing for the worse. Unable to pay in full, but believing that the Project was still viable, Mr. Caldwell spoke with Mr. Newby about getting an extension of time to pay the Esplanade Sale Notes. Mr. Newby then went to Mr. Rinehart and said that, as a two-thirds owner, he wanted to grant an extension. Mr. Rinehart said "great," and so they did. [118] Mr. Rinehart prepared a "Forbearance Agreement" (the "First Forbearance Agreement"). In the First Forbearance Agreement, effective as of October 1, 2020, Mr. Caldwell, as Maker, acknowledged the amount of the debt pursuant to the Esplanade Sale Notes; acknowledged that the Esplanade Sale Notes were secured "by a Deed of Trust, Assignment of Rents, Security Agreement Fixture Filing (the 'Deed of Trust')" that was recorded on July 22, 2020, in the real property records of Salt Lake County, Utah; and affirmed the Esplanade Sale Notes and Deed of Trust.[119] Mrs. Newby and PLR, as Holders" agreed in the First Forbearance Agreement to extend the maturity date of the Esplanade Sale Notes for an additional month and to forbear on exercising their remedies under the Esplanade Sale Notes for up to three one-month extension periods, among other things.[120]

Paragraph 6 of the First Forbearance Agreement provided:

> <u>Reliance</u>. Maker understands and agrees that Holders are relying on the representations, warranties, statements and acknowledgements of Maker stated herein. Maker

---

115 Tr. at 264-65.
116 Tr. at 265.
117 Tr. at 265-66.
118 Tr. at 89-91. Mr. Rinehart testified as to what Mr. Newby said. However, by this time neither Mr. Newby nor Mrs. Newby was an owner of Esplanade, and only Mrs. Newby was owed anything by Mr. Caldwell pursuant to the Newby Note.
119 Ex. 15 at 1.
120 Ex. 15 at 2.

> understands and agrees that each of the representations, warranties, covenants, agreements and acknowledgments of Maker contained herein is material and that no representation, warranty, covenant, agreement and/or acknowledgment by Maker contained herein or in other Loan Document contains any untrue statement of a material fact or omits any material fact or statement necessary to make the facts or statements contained herein not false or misleading. Instead, all of the representations and warranties contained herein and in each Loan Document were and are true, accurate, correct and complete, both on the date first made and on and on and as of the Effective Date.[121]

Paragraph 19 of the First Forbearance Agreement provided:

> No Other Promises; Entire Agreement. There are no written or oral agreements among or between the Parties which are not set forth herein and in the Loan Documents. Holders and their agents have not made any representations or promises or provided any inducements other than as specifically described herein. There are no unresolved issues, no side agreements, and no terms beyond or different from those described herein as far as matters covered by this Agreement and the Loan Documents are concerned. [122]

Mr. Caldwell, as manager of Esplanade, Mrs. Newby, and Mr. Rinehart, as manager of PLR, each signed the First Forbearance Agreement.[123]

Esplanade made two or three payments on the Esplanade Sale Notes, but the balance remained unpaid. Mr. Caldwell asked Mr. Newby for further extensions. Eventually, the parties entered into a "Second Forbearance Agreement," effective January 1, 2021.[124] The Second Forbearance Agreement was quite similar to the First Forbearance Agreement, except that it contained a new waiver provision related to any claims that might have accrued between October 1, 2020, and January 1, 2021, and included a provision whereby Mr. Caldwell personally guaranteed payment of the Esplanade Sale Notes.[125] Thereafter, Mr. Newby had further discussions with Mr.

121 Ex. 15 at 3.
122 Ex. 15 at 7.
123 The copy of the First Forbearance Agreement admitted into evidence is signed by Mr. Caldwell as manager of Esplanade, but is not signed by Mrs. Newby or by Mr. Rinehart as manager of PLR; however, Mr. Rinehart testified that there exists a fully signed copy of the document and that Exhibit 15 is a true and accurate copy of the First Forbearance Agreement. No party objected to the admission of Exhibit 15. Tr. at 91-92.
124 Ex. 16.
125 Tr. at 108-110; Ex. 16.

Caldwell. After such discussions, Mrs. Newby and PLR agreed to further forbear. Each of them entered into a new agreement (the "Third Newby Forbearance Agreement" and the "Third PLR Forbearance Agreement, respectively, or collectively the "Third Forbearance Agreements") with Mr. Caldwell, effective April 1, 2021. In the Third Forbearance Agreements, Mr. Caldwell again reaffirmed Esplanade's obligations to each party and personally guaranteed the full payment and performance of all obligations of Esplanade under the Esplanade Sale Notes.[126]

With each request for forbearance, Mr. Rinehart's doubts about Mr. Caldwell's capacity to pay the Esplanade Sale Notes grew.[127] Indeed, by the time of the Second Forbearance Agreement, he had come to believe that PLR and Mrs. Newby should sue on the Esplanade Sale Notes rather than agreeing to further forbearance; however, because "it was the decision of [the group] jointly to extend [the time to pay the Notes, Mr. Rinehart] fully supported that extension."[128] By the third request for forbearance, Mr. Rinehart had started to believe that Mr. Caldwell had misrepresented himself or engaged in some "hanky panky."[129] Still, despite his suspicions, Mr. Rinehart deferred to Mr. Newby's business judgment and agreed to the requested forbearance.[130] Before doing so, neither the Newbys nor Mr. Rinehart on behalf of PLR conducted any additional investigation as to Mr. Caldwell's financial wherewithal.[131] And Mr. Caldwell did not share any additional financial documents.[132]

## F. <u>The Esplanade Bankruptcy</u>.

On July 7, 2021, Mr. Caldwell caused Esplanade to file for relief under Chapter 11 of the Bankruptcy Code in a case designated as a single-asset real estate case.[133] In its Schedule A/B, Esplanade listed real estate owned by Esplanade (valued at $6.9 million) as its only significant asset.[134] Esplanade identified secure claims of Broadmark (for $5 million), Cynthia Newby (for $600,000), and others on Schedule D, but did not list PLR are a creditor.[135] By this time, Broadmark was in the process of trying to foreclose on the Project and Esplanade was insolvent. Mr. Caldwell knew that Esplanade needed more time to get additional financing in place through refinancing or

---

126 Ex. 17 and 26. The Third Forbearance Agreements are substantively similar to the Second Forbearance Agreement. However, the Third Newby Forbearance Agreement refers only to Mrs. Newby as "Maker" and relates to only the relevant Newby Note and Deed of Trust, while the Third PLR Forbearance Agreement refers only to PLR as "Maker" and relates to only the relevant or PLR Note and Deed of Trust. Further, though the Third PLR Forbearance Agreement is titled "Third Forbearance Agreement," the Third Newby Forbearance Agreement is titled "Second Forbearance Agreement."

127 Tr. at 136-37.

128 Tr. at 99, 136-37.

129 Tr. at 136-37.

130 Tr. at 163-64.

131 Tr. at 133.

132 Tr. at 107.

133 Ex. 1.

134 Ex. 2 at 23.

135 Ex. 2 at 26-29. Esplanade did list PLR as an entity to be notified with respect to a scheduled claim. Ex. 2 at 30.

sale of the Project, so he filed the bankruptcy case to get this time.[136] Esplanade's bankruptcy case did not succeed; it was dismissed on September 7, 2021.[137] Ultimately, Broadmark foreclosed on the properties that had been owned by Esplanade. The real estate remains unimproved.[138]

## G. The State Court Case Against Mr. Caldwell.

On August 25, 2021, Mrs. Newby and PLR initiated a lawsuit against Mr. Caldwell, individually, in the State Court Action.[139] In the complaint in the State Court Case, PLR and Ms. Newby asserted a cause of action for breach of personal guarantee for the PLR Note and Third Forbearance Agreement, and a cause of action for breach of personal guarantee of the Newby Note and Third Forbearance Agreement.[140] On advice of their counsel in the State Court Case, Mrs. Newby and PLR kept the case simple by asserting only claims for breach of the Esplanade Sale Notes. They did not bring any claims for fraud, false representation, embezzlement, or willful and reckless conduct.[141] Default judgment in the amount of $876,402.44 entered against Mr. Caldwell and in favor of Mrs. Newby and PLR in the State Court Case on September 20, 2023.[142] Mr. Caldwell has not paid any amounts on the judgment.[143]

## H. Mr. Caldwell's Bankruptcy Case.

Mr. Caldwell filed for relief under Chapter 7 of the Bankruptcy Code on May 16, 2024 (the "Petition Date"). In Mr. Caldwell's Statement of Financial Affairs, he omitted mention of the State Court Case, which had concluded less than a year before, with entry of the default judgment.[144] In Schedule A/B, Mr. Caldwell listed approximately

---

136 Tr. at 268-269.

137 Ex. 3 at 5 and Ex. 4. In the "Plaintiff's Written Closing Argument" (Docket No. 51), the Plaintiffs state that, in reviewing the Esplanade bankruptcy case filings, Mr. Rinehart learned that the Debtor was using Esplanade "as his alter ego" and that he "failed to observe proper corporate formalities and failed to maintain insurance" for Esplanade. (Docket No. 51 at 20). The evidence does not support such a sweeping contention. Instead, the evidence shows that Mr. Caldwell did not make contracts between himself and his entities, or between entities that he owned. (Ex. 3 at Tr. at 225-226.) Exhibit 3 shows that, with respect to four entities (CI Holdings 3, LLC; LOC Business Management, LLC; Mountain Standard Construction, LLC; and Paradigm Real Estate Ogden, LLC) Mr. Caldwell, on behalf of Esplanade, stated that there were no written agreements to support assertions made in Esplanade's bankruptcy schedules that it owed debts to those entities.

138 Tr. at 262-63.

139 Ex. H.

140 Ex. H at 4-5.

141 Tr. at 138-39.

142 A copy of the judgment in the State Court case was attached to the Complaint as Exhibit 1 (Adversary Proceeding Docket No. 1-1). Mr. Caldwell does not contest that the judgment was entered, nor the amount of the judgment. The Court finds it odd that the judgment is in the aggregate and in favor of both Mrs. Newby and PLR, rather than for $400,000 plus interest and costs in favor of Mrs. Newby and $200,000 plus interest and costs in favor of PLR; however, it appears to the Court that the judgment was entered in the aggregate pursuant to a "Settlement Stipulation" (Ex. 5) filed in the State Court Case.

143 Tr. at 197 and 235-36.

144 Ex. 30 at 10.

$60,859.71 in assets, not including any real estate.[145] He also listed ownership interests in numerous limited liability companies, including 100% interests in LOC Business Management LLC; LOC Legacy Ranch LLC; Paradigm Real Estate Ogden LLC; Caldwell Investments LLC; and LOC Colorado Investments LLC; a 50% interest in WCGK Holdings LLC; and a 20% interest in Lodge Falls Apartments LLC.[146] He valued all such interests at $0.00.[147]

On his Schedules D and E/F, Mr. Caldwell listed $4,826,719.67 in liabilities, including an unsecured, non-priority claim of "Kesler Rust Law Offices" for "Collection – PLR, LLC and Cynthia Newby" in an "Unknown" amount. Mr. Caldwell did not assert that such debt was "contingent," "unliquidated," or "disputed."[148]

After reviewing Mr. Caldwell's bankruptcy Schedules and after questioning Mr. Caldwell at the Section 341 meeting of creditors, Mr. Rinehart came to understand that Mr. Caldwell did not directly own much, if any real estate; instead, Mr. Caldwell's interests were held through a series of limited liability companies.[149] After the Section 341 meeting, Mr. Rinehart decided to engage counsel to pursue an adversary proceeding against Mr. Caldwell for nondischargeability.[150]

## V. Legal Analysis and Conclusions.

### A. General Legal Framework.

#### 1. Statutory Text.

The bankruptcy statutes relied upon by the Plaintiffs in the Complaint (Section 523(a)(2)(A) and (B), (a)(4), and (a)(6)) provide:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt — . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing—
>
> (i) that is materially false;

145 Ex. 30 at 17 and 19-24.
146 Ex. 30 at 21-22.
147 *Id.*
148 Ex. 30 at 35.
149 Tr. at 118-120.
150 Tr. at 120-21.

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6).

**2. <u>Burden of Proof</u>.**

Generally, the Plaintiffs bear the burden of establishing nondischargeability of a particular debt under Section 523(a) by a preponderance of the evidence. *Grogan*, 498 U.S. at 287 ("Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests."); *Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015) (requiring creditor to prove Section 523(a) claims by a preponderance of the evidence). Additionally, exceptions to discharge under Section 523(a) "are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997). *See also Sawaged v. Sawaged (In re Sawaged)*, 2011 WL 880464, at *3 (Bankr. D. Colo. Mar. 15, 2011) (same, quoting *Kaspar*).

**3. <u>Nondischargeability Standard Under Section 523(a)</u>.**

All Section 523(a) nondischargeability claims require a two-part analysis. First, "the bankruptcy court must determine the validity of the debt under applicable law." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016); *see also Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. BAP 2003) (if the alleged debt is for fraud, "state law of fraud controls with respect to whether fraud has occurred"). This is referred to as the "claim on the debt" component. *Thompson*, 555 B.R. at 8. Second, if there is a valid debt, "the bankruptcy court must determine the dischargeability of that debt under § 523." *Id*. *See also Lang*, 293 B.R. at 513 ("bankruptcy law controls with respect to the determination of nondischargeability"). This is referred to as the "dischargeability" component. *See Thompson*, 555 B.R. at 8 (referring to the second component as the "dischargeability claim"). There may be substantial overlap between

the "claim on the debt" and the "dischargeability" components, especially with respect to allegations of fraud and misrepresentation.

## B. Mr. Caldwell Owes a Debt to the Plaintiffs.

As set forth in *Thompson*, 555 B.R. at 8, the first part of the nondischargeability exercise is to determine whether the bankruptcy debtor owes the creditor a valid debt. In this Adversary Proceeding, the Plaintiffs have already obtained a judgment in the amount of $876,402.44 against him on account of two breach of contract claims asserted in the State Court Case. Mr. Caldwell does not contest that he owes such debt. However, he does contest that the debt is nondischargeable pursuant to Section 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6). So, the "dischargeability component" is the only issue in dispute.

## C. Claim to Establish Nondischargeability Under Section 523(a)(2)(A).

In their First Claim, the Plaintiffs assert that the debt owed to them by Mr. Caldwell is nondischargeable under Section 523(a)(2)(A).

### 1. Dischargeability Under Section 523(a)(2)(A).

Section 523(a)(2)(A) contains three subparts: (1) false pretenses; (2) false representation; or (3) actual fraud.[151] However, Section 523(a)(2)(A) "expressly excludes all statements respecting a debtor's financial condition, whether written or oral, as a basis for nondischargeability." *Kapitus Servicing, Inc. v. Friedlander (In re Friedlander)*, 2021 WL 3889786, at *4 (Bankr. N.D. Ohio Aug. 27, 2021). So, the first step in the nondischargeability analysis is determining whether alleged false representations that give rise to a claim under Section 523(a)(2)(A) are "statements respecting a debtor's or an insider's financial condition."

#### a. Standard for Evaluating Whether a Representation Constitutes a Statement Respecting the Debtor's or an Insider's Financial Condition.

The United States Supreme Court squarely addressed the issue of what constitutes a "statement respecting the debtor's or an insider's financial condition" in a recent decision: *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018). Writing for the Court, Justice Sotomayor started by succinctly identifying the Section 523(a)(2)(A) issue: "This case is about what constitutes a 'statement respecting the debtor's financial condition.'" *Id.* at 712. In *Lamar*, the debtor falsely told his law firm creditor in March 2005 that "he was expecting a tax refund of 'approximately $100,000'" which would cover his legal fees." *Id.* at 713. Months later, in November 2005, the

[151] The Court construes the Complaint as asserting all three types of Section 523(a)(2)(A) nondischargeability. *See* Docket No. 1 ¶ 103 ("The Debtor obtained money and/or property from, incurred debts and liabilities to, and/or obtained an extension, renewal, or refinancing of creditor from PLR and Mrs. Newby by false pretenses, false representations, or actual fraud . . . .")

debtor represented that "he had not yet received the refund." *Id.* In reality, the debtor in *Lamar* was a scallywag: He had, in fact, received a tax refund in October, but in an amount far less than $100,000, and had spent the refund on his own business without paying the law firm. *Id.* Thus, it was undisputed that the debtor in *Lamar* lied during his conversations with the creditor.

Parsing the Section 523(a)(2)(A) statutory language, the Supreme Court analyzed the "ordinary meanings" of the words: "statement"; "financial condition"; and "respecting." *Id.* at 715-16. The *Lamar* Court determined that "a statement" is "the act or process of stating, reciting, or presenting orally or on paper; something stated as a report or narrative; a single declaration or remark." *Id.* at 716 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2229 (1976)). And "financial condition" means "one's overall financial status." *Id.* But the real linchpin to the statutory exercise is the word "respecting." According to the Supreme Court, the term "respecting" means "in view of; considering; with regard or relation to; regarding; concerning." *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1934 (1976)). The word "respecting" must be read "expansively." *Id.* at 716-17.

Justice Sotomayor put the terms and phrases together and held that even "a statement about a single asset" (*i.e.*, the expected tax refund) "can be a 'statement respecting the debtor's financial condition.'" *Id.* at 712, 720. Ultimately, the Supreme Court determined that the false oral statement about the debtor's tax refund was a "statement respecting the debtor's financial condition" and so not actionable under Section 523(a)(2)(A), even if a lie. In reaching that holding, the Supreme Court observed that "[t]he text of Section 523(a)(2) plainly heightens the bar to discharge when the fraud at issue was effectuated via a 'statement respecting the debtor's financial condition.'" *Id.* at 723. Such statements are only actionable if in writing and according to Section 523(a)(2)(B) — not Section 523(a)(2)(A). *See also Land Inv. Club, Inc. v. Lauer (In re Lauer)*, 371 F.3d 406, 413 (8th Cir. 2004) ("Subsections 523(a)(2)(A) and (B) are mutually exclusive."); *Am. Nat'l Bank v. Dalcourt (In re Dalcourt)*, 354 B.R. 868, 874 (Bankr. N.D. Iowa 2006) (same).

**b. <u>The Allegedly Actionable Statements Identified by the Plaintiffs</u>.**

In their Complaint, the Plaintiffs asserted that Mr. Caldwell made a number of false statements to induce them to sell the Project to them.[152] In their Written Closing Argument, however, the Debtors identified only seven false statements upon which they allegedly relied in entering into the Esplanade PSA and/or the Forbearance Agreements.[153] Specifically, those statements are: (1) Mr. Caldwell had an "annual

---

152 Docket No. 1 ¶¶ 45-47.

153 Since the Plaintiffs did not present evidence at trial that any additional representations were false, nor argue that they were in their Written Closing Argument, they waived any argument that any such additional representations constitute grounds for a claim of nondischargeability under Section 523(a)(2)(A). *See In re Molycorp., Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1003 n.10 (D. Colo. 2016) (an argument "raised in a perfunctory manner" is deemed waived). *Cf. Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

salary [of] $240,000”; (2) “such income was from “Owners Disbursements from [Mr. Caldwell’s] Businesses”; (3) Mr. Caldwell had “additional ‘Net Real Estate Income’ of $350,000; (4) Mr. Caldwell had $180,000 in cash at Wells Fargo Bank in a ‘business account’”; (5) Mr. Caldwell “only owned one parcel of real estate”; (6) Mr. Caldwell “owned $65,125,070 in investment real estate”; and (7) Mr. Caldwell’s “net worth exceeded $41,000,000” (together the "Statements").[154] It is clear that each of the foregoing Statements is a “statement” of the debtor, Mr. Caldwell, because they are allegations about “something stated as a report or narrative; a single declaration or remark.” *Lamar,* 584 U.S. at 709 (quoting WEBSTER’S THIRD NEW INTERNATIONAL DICTIONARY 2229 (1976)). And, for purposes of evaluating the Plaintiffs’ claim under Section 523(a)(2)(A) only, the Court assumes (without deciding) that all of the Statements are false and that the Statements were made to the Plaintiffs.

### c. <u>**The Statements Are Statements Respecting the Debtor’s or an Insider’s Financial Condition**</u>.

Applying the *Lamar* standard, the Court determines that all of the Statements are statements regarding Mr. Caldwell’s financial condition, or the condition of one of his related entities.

First, the Statements are all related to Mr. Caldwell’s own circumstances, or the circumstances of his limited liability companies, and the limited liability companies are “insiders” of Mr. Caldwell because Mr. Caldwell owned the limited liability companies. *See* 11 U.S.C. §§ 101(31)(A)(iv) (defining the term “insider” to include “a corporation of which the debtor is a director, officer, or person in control” when the debtor is an individual) and 101(9) (defining the term “corporation” to include an “unincorporated company or association” such as a personal limited liability company).

Second, the Statements are statements “respecting . . . the debtor’s or an insider’s financial condition.” That is — they relate to or are made “in view of” or “considering” Mr. Caldwell’s and/or his LLCs’ “overall financial status” or their “ability to repay a debt. *See Lamar*, 584 U.S. at 716. *See also*, *e.g.*, *In re Sansoucy*, 136 B.R. 20, 23 (Bankr. D.N.H. 1992) (pre-*Lamar* case holding that representation as to financial solvency of partnership was statement of financial condition because it reflected overall economic condition of partnership).[155] This is not particularly surprising, since most of such statements were made in a document entitled “Personal Financial Statement.”

---

[154] Docket No. 51 at 25.

[155] It is worth noting that the Plaintiffs identified no statements *unrelated to Mr. Caldwell’s or an insider’s financial condition* which they contend were false. For example, they do not assert that Mr. Caldwell’s statement that he formed hundreds of LLCs was false, nor do the contest the statement that he engaged in the real estate transactions he told them about and listed in the Caldwell Resume. They also do not challenge the truth of Mr. Caldwell’s statements regarding his credentials in the Caldwell Resume. Because the Plaintiffs have not identified any alleged false statement that is *not* a “statement[] respecting a debtor’s or an insider’s financial condition,” they have failed to meet their burden under Section 523(a)(2)(A).

But, statements "respecting the debtor's or an insider's financial condition" cannot form the basis for a claim under Section 523(a)(2)(A). And the Debtors have not identified any other allegedly false statements made by Mr. Caldwell as a basis for their claim.

### 2. The 523(a)(2)(A) Claim Fails as a Matter of Law.

Because the Plaintiffs have not shown that Mr. Caldwell's debt was obtained by "false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition,*" their claim to establish that his debt to them is nondischargeable pursuant to Section 523(a)(2)(A) fails as a matter of law. *Lamar,* 584 U.S. at 709; *Friedlander*, 2021 WL 3889786, at *4 ("Section 523(a)(2)(A) expressly excludes all statements respecting a debtor's financial condition, whether written or oral, as a basis for nondischargeability."). The Court, therefore, dismisses the First Claim and need not address the other elements of Section 523(a)(2)(A).

## D. Claim to Establish Nondischargeability Under Section 523(a)(2)(B).

In their Second Claim, the Plaintiffs assert that the debt owed to them by Mr. Caldwell is nondischargeable under Section 523(a)(2)(B).

### 1. Dischargeability Under Section 523(a)(2)(B).

Under 11 U.S.C. § 523(a)(2)(B):

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — . . .
>
> (B) use of a statement in writing —
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive . . . .

Put another way, Section 523(a)(2)(B) requires that a plaintiff must prove the following by a preponderance of the evidence:

(1) The debtor used a statement in writing.

(2) The statement was materially false.

(3) The statement concerned the debtor's or an insider's financial condition.

(4) The creditor reasonably relied on the statement; and

(5) The debtor made or published the statement with the intent to deceive the creditor.

*Legacy Bank v. Rund (In re Rund)*, 2026 WL 146894, at *3 (W.D. Okla. Jan. 26, 2026); *Bailey v. Turner (In re Turner)*, 358 B.R. 422, 424 (Bankr. N.D. Okla. 2006) (noting creditor must prove claim under Section 523 by preponderance of the evidence). In contrast to claims under Section 523(a)(2)(A), which cannot be predicated on a statement respecting the debtor's or an insider's financial condition and need not identify a written statement, a claim under Section 523(a)(2)(B) requires a statement, in writing, respecting the debtor's or an insider's financial condition. *Lamar*, 584 U.S. at 715. As such, subsections 523(a)(2)(A) and (B) are mutually exclusive. *Land Inv. Club, Inc. v. Lauer (In re Lauer)*, 371 F.3d 406, 413 (8th Cir. 2004); *Dalcourt*, 354 B.R. at 874; *Fusion Indus., LLC v. Friday (In re Friday)*, 2025 WL 892618, at *8 (Bankr. W.D. Okla. Mar. 21, 2025). In this case, the Statements are statements respecting the Debtor's or an insider's financial condition which might qualify if the other requirements of Section 523(a)(2)(B) are met.

**a. <u>Intent to Deceive</u>.**

Debtor defendants rarely acknowledge intent to deceive in Section 523(a)(2)(B) cases. Accordingly, intent to deceive typically is evaluated based upon circumstantial evidence. "A creditor may prove intent to deceive through direct evidence or a court may infer intent from the totality of the circumstances." *Assoc. Mortg. Corp. v. Weaver (In re Weaver)*, 579 B.R. 865, 891 (Bankr. D. Colo. 2018) (citations omitted). *See also Tobias v. Alvarado (In re Alvarado)*, 608 B.R. 877, 885 (Bankr. W.D. Okla. 2019) ("Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize it may be established by circumstantial evidence or by inferences drawn from a course of conduct or from the totality of the circumstances.") (citations omitted); *DRCK, LLC v. Chong (In re Chong)*, 523 B.R. 236, 243 (Bankr. D. Colo. 2014) ("Intent to deceive can be inferred from the totality of the circumstances.").

An intent to deceive does not require that a debtor acted with a "malignant heart," but can be found where "made with reckless disregard for the truth." *Weaver*, 579 B.R. at 891. *See also Santiago v. Hernandez (In re Hernandez)*, 452 B.R. 709, 721 (Bankr.

N.D. Ill. 2011) ("[W]here the debtor knowingly or recklessly makes false representations that he knows or should know will induce another to act, the court can infer an intent to deceive."). Still, a "finding of reckless disregard should be very narrowly interpreted because a misrepresentation is fraudulent only if the maker 'knows or believes the matter is not what he represents it to be.'" *First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 673 (10th Cir. BAP June 24, 2005), *aff'd* 2006 WL 1875366 (10th Cir. 2006) (citing *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 787 (10th Cir. BAP 1998)).

**b. <u>Reasonable Reliance</u>.**

Reasonable reliance is an objective standard based upon whether a reasonably prudent person (or company) in similar circumstances would have relied on the alleged false representations. The question of whether a creditor's reliance on a debtor's representation in his or her financial statement is "reasonable" "is a factual determination." *Leadership Bank, N.A. v. Watson (In re Watson)*, 958 F.2d 977, 978 (10th Cir. 1992). The Tenth Circuit in *Leadership Bank* instructed:

> "[The] standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon debtor's representations . . . [T]he reasonableness of a creditor's reliance will be evaluated according to the particular facts and circumstances present in a given case." . . . In evaluating a creditor's reliance on a false financial statement, a court may not substitute its judgment for the business judgment of the creditor in deciding to make the loan.

*Leadership Bank*, 958 F.2d at 978 (quoting *First Bank v. Mullet (In re Mullet*), 817 F.2d 677, 679, 681-82, 682 (10th Cir.1987)) (brackets in original). Indeed, as the Tenth Circuit Bankruptcy Appellate Panel cautioned:

> A creditor may not . . . simply bury its head in the sand and assume everything the debtor presents in his financial statement is accurate, but must take reasonable steps, depending on the circumstances, to verify the provided information.
>
> There are situations, however, where a creditor may not be charged with a duty to affirmatively investigate a financial statement. The Tenth Circuit Court of Appeals has identified several situations where a creditor's reliance on the debtor's representations was deemed reasonable without verifying steps. These include the following: (1) cases involving "ongoing relationships between the debtor and creditor;" (2) cases where "statements contained no information indicating

> that further investigation was required;" (3) cases where there is "no indication that further investigation would have uncovered the falsity of the representations;" or (4) cases where "the asserted failure to verify occurred after the loan had been made."

*Rural Enters. of Okla., Inc. v. Watson (In re Watson),* 294 B.R. 198, 2003 WL 21241702, at *4 (10th Cir. BAP 2003) (unpublished) (quoting *Mullet,* 817 F.2d at 681).

### 2. <u>The Plaintiffs Have Failed to Meet Their Burden Under Section 523(a)(2)(B)</u>.

The Plaintiffs assert that the Debtor made each of the Statements in the Financial Documents: (1) Mr. Caldwell had an "annual salary [of] $240,000"; (2) "such income was from "Owners Disbursements from [Mr. Caldwell's] Businesses"; (3) Mr. Caldwell had "additional 'Net Real Estate Income' of $350,000; (4) Mr. Caldwell had $180,000 in cash at Wells Fargo Bank in a 'business account'"; (5) Mr. Caldwell "only owned one parcel of real estate"; (6) Mr. Caldwell "owned $65,125,070 in investment real estate"; and (7) Mr. Caldwell's "net worth exceeded $41,000,000".

For present purposes, the Court will assume (without deciding) that Mr. Caldwell made the foregoing Statements to the Plaintiffs, that they were false, and that the Plaintiffs relied upon the Statements. (There are significant evidentiary disputes about each of the foregoing.) But even with such assumptions, something more is required. The key question (even before assessing whether the Debtor had the requisite "intent to deceive") is whether the Plaintiffs' reliance on the Statements was "reasonable" within the meaning of Section 523(a)(2)(B)?

Mr. Caldwell was not known to the Plaintiffs until April 2020. By that time, foreclosure on Esplanade's real properties had been threatened and was imminent, as the Plaintiffs had not found any way to refinance and had not been able to convince any financial institution or prospective partner to bring money to the Project. Circumstances were dire. Not only did Mr. Rinehart and Mrs. Newby face the danger of seeing the value of Esplanade dissolve as a result of foreclosure, but the Newbys had guaranteed the Miller Loan and faced the prospect of being held personally liable for any deficiency owed after a foreclosure sale.

Enter Mr. Caldwell — an investor who presented himself (a) as having both the experience and the financial wherewithal to pay the outstanding debt owed by Esplanade plus additional funds to the Plaintiff; and (b) as seeing the value in using ICF in the Project and of employing Mr. Newby to do the construction.

Somehow (the Court does not know exactly how or when), the Plaintiffs came into the possession of the Financial Documents which provided some information about Mr. Caldwell's financial condition. The Court finds that the Plaintiffs entered into the Esplanade PSA (and later into the Forbearance Agreements), at least in part, because

they believed that Mr. Caldwell had the financial capacity and experience to help them turn the dream of the Project into a reality.

Unfortunately, the financial picture set forth in the Financial Documents seems rosier than the reality may have been. A reasonable person contemplating sale of Esplanade and viewing such documents would have looked beyond the Financial Documents to get a fuller picture of Mr. Caldwell's financial state. But, the Plaintiffs did absolutely nothing to verify the accuracy (or inaccuracy) of any of the Statements or any other details in the Financial Documents until after their deals with Mr. Caldwell went south.

Though Mr. Caldwell was a complete stranger to the Plaintiffs (*i.e.*, a person with no pre-existing relationship with the Plaintiffs), the Plaintiffs did not ask Mr. Caldwell to provide any bank statements for him or his limited liability companies. They did not request to review Mr. Caldwell's tax returns or the tax returns of his limited liability companies. They did not ask for references. They did not conduct a simple search of property records to verify any claimed real estate holdings or determine the true scope of Mr. Caldwell's personal real estate holdings or the holdings of his limited liability companies. They did not search the records of the Utah Secretary of State to ascertain the number of limited liability companies that Mr. Caldwell owned, nor take any steps to evaluate the value of his interests in his companies. Aside from the Financial Documents, the Plaintiffs did not review any balance sheets or profit or loss statements for any of Mr. Caldwell's other limited liability companies, or for any other periods of time.

The Paradigm P&L was unsigned, unaudited, and not presented under oath or penalty of perjury. The CIL P&L was unsigned, unaudited, and not presented under oath on penalty of perjury. The CIL Balance Sheet was unaudited and signed but using the wrong name: "William H. Calewell." The CIL Balance Sheet was not presented under oath on penalty of perjury.

The Personal Financial Statement was executed by Mr. Caldwell, but not under oath on penalty of perjury as the Plaintiffs erroneously assumed. Importantly, the Personal Financial Statement referenced nine "Schedules," which were apparently intended to provide more details for the listing of "Assets" and "Liabilities." However, the schedules were not attached. And, the Plaintiffs did not ask for the schedules. The Personal Financial Statement confirmed that Mr. Caldwell was a defendant in a "suit or legal action"; but, the Plaintiffs did not inquire about the issue. The Personal Financial Statement disclosed that Mr. Caldwell was a "Co-Maker, Endorser, or Guarantor" of other debt. However, in an inconsistent fashion, Mr. Caldwell did not list such guarantees as "Liabilities" on the Personal Financial Statement. The Plaintiffs did not inquire whether Mr. Caldwell had banking relationship with U.S. Bank, the target recipient of the Personal Financial Statement. Given the amount of the asserted "Assets" in the Personal Financial Statement ($73,764,070) and missing information and inconsistencies, more diligence obviously should have been undertaken.

Again, the Plaintiffs had never done business with Mr. Caldwell. They did not know him. But they did zero investigation about Mr. Caldwell and his companies — not even a basic Google search. Assuming that the Plaintiffs relied on the Statements (a big assumption given the dearth of evidence), the Court assesses that such reliance was not reasonable under the circumstances (particularly given the size of the proposed transaction). And, there were red flags too. The Newbys and Mr. Rinehardt were aware that Mr. Caldwell was cash-short and so could not come up with the funds to pay for the purchase of the Esplanade membership interests under the Esplanade PSA. Thus, the carry-back represented by the Esplanade Sale Notes (and later, the multiple forbearance agreements).

Mr. Rinehart's testimony on reasonable reliance was particularly enlightening:

> Q. We've identified these documents that you got [the Financial Documents] . . . . Other than that, other than your just receipt of it, did you do any due diligence?
>
> A. No . . . we took them at face value . . . .
>
> Q. And did your client Esplanade do any due diligence or Mr. Newby? Did either of them do any due diligence?
>
> A. No. Looking behind the statements, no. We took them at face value and assumed they were true.[156]

One wonders why Mr. Rinehart did not do anything further. He explained:

> Q. What did you come to understand then from this personal financial statement about Mr. Caldwell's wherewithal?
>
> A. Well, it shows that he personally has substantial worth and he delivered it to the bank under penalties of perjury, which was very reassuring to me.[157]

Several more times during his testimony Mr. Rinehart emphasized the critical nature of the Personal Financial Statement's being submitted under oath under "penalty of perjury."[158] However, neither the Personal Financial Statement nor any of the other Financial Documents contain any reference to having been submitted under "penalty of perjury." Indeed, the Court received no evidence as to where the Financial Documents came from, and the evidence is unclear about whether the Personal Financial Statement actually was presented to any financial institution. So, the reliance was, objectively, unreasonable.

---

156 Tr. at 146-47.
157 Tr. at 75.
158 Tr. at 76, 146, and 172.

Again, the Plaintiffs elected to not conduct even the most cursory investigation about Mr. Caldwell and his financial circumstances. The lack of any investigation is all the more surprising because the Newbys had just shortly before their transaction with Mr. Caldwell been defrauded by Bob Jones. Mr. Jones absconded with approximately $3.5 million of the Newbys' money and disappeared. Mr. Rinehart knew the background because he represented the Newbys in trying to recover from Mr. Jones. Inexplicably, that unfortunate experience seems to have taught the Plaintiffs nothing about the importance of investigating potential business relationships. Mr. Rinehart's conduct is also very puzzling because of his substantial experience in corporate and real estate transactions.

The Court concludes that the Plaintiffs buried their heads in the proverbial sand and relied on hope, rather than reason, whey they entered into the Esplanade PSA and Forbearance Agreements. Because of the Plaintiffs' failure to take any steps whatsoever to verify the truth of the Statements, the Court cannot find that their reliance on the Statements was reasonable. The Court, therefore, dismisses the Section 523(a)(2)(B) claim. Given the foregoing, the Court need not decide the tough question of whether Mr. Caldwell had the "intent to deceive" required by Section 523(a)(2)(B) nor to consider any of the other elements of the Second Claim.

**E. <u>Claim to Establish Nondischargeability Under Section 523(a)(4)</u>.**

In the Third Claim, the Plaintiffs assert that the Court should determine that the debt owed to them by the Debtor is nondischargeable pursuant to Section 523(a)(4).

**1. <u>Dischargeability Under Section 523(a)(4)</u>.**

Section 523(a)(4) provides:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt — . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

The statutory text reveals four varieties of Section 523(a)(4) claims: (1) fraud while acting in a fiduciary capacity; (2) defalcation while acting in a fiduciary capacity; (3) embezzlement; or (4) larceny. A critical element of the first two varieties, fraud or defalcation, is that the debtor must be acting in a "fiduciary capacity." Embezzlement and larceny, however, do not require that the plaintiff and the debtor stand in a fiduciary relationship. *See Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 275 (2013) ("The statutory provision [Section 523(a)(4)] makes clear that [embezzlement and larceny] appl[ies] outside of the fiduciary context . . . .").

In the Complaint, the Plaintiffs asserted a claim predicated on just one variety of Section 523(a)(4) claim: embezzlement. Specifically, they asserted that Mr. Caldwell entrusted "the Project, Esplanade, and their equity in Esplanade" to Mr. Caldwell to

secure repayment of the Esplanade Sale Notes, and that Mr. Caldwell used their property for a purpose other than that for which it was entrusted and with the intention of permanently depriving the Plaintiffs of their property. They further asserted that the Debtor did so with fraudulent intent.[159]

### 2. <u>The Plaintiffs Have Failed to Meet Their Burden Under Section 523(a)(4)</u>.

"Embezzlement" means "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Kim v. Sung (In re Sun)*, 535 B.R. 358, 367 (10th Cir. BAP 2015) (quoting *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir. 1988)). *See also Adams v. Meagher (In re Meagher)*, 2012 WL 5893483, at *6 (Bankr. D. Colo. Nov. 23, 2012) (same). To state a claim for embezzlement, a plaintiff must allege:

(1) Entrustment (property lawfully obtained originally);

(2) Of property;

(3) Of another;

(4) That is misappropriated (used or consumed for a purpose other than that for which it was entrusted);

(5) With fraudulent intent.

*Alternity Cap. Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321, 325 (Bankr. D. Colo. 2013) (quoting *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002)). *See also Meagher*, 2012 WL 5893483 at *6 (adopting list of elements); *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876 (Bankr. D. Colo. 2004) (same). "Embezzlement, for purposes of 11 U.S.C. § 523 . . . 'requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.'" *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986). The fifth element, "fraudulent intent," requires a heightened *mens rea* of "intent to permanently deprive." *Ghaemi*, 492 B.R. at 327. Embezzlement involves an element of intent, "'the *animus furandi*' or intention to steal." *Id.*

As Mr. Caldwell argues in his closing arguments, pursuant to the Esplanade PSA, the Plaintiffs *sold* property that belonged to them (their equity interests in Esplanade) to CIL in exchange for payoff of the liabilities on the Project (which were personally guaranteed by the Newbys) and the Esplanade Sale Notes. The Plaintiffs, in fact, received all the consideration they were entitled to receive pursuant to the Esplanade PSA: payoff of the Axiom Loan and Miller Loan, release of their guaranties, and the Esplanade Sale Notes. After completion of the transaction, CIL owned Esplanade and all of its property interests. As such, when Mr. Caldwell, through CIL,

---

[159] Docket No. 1 ¶¶ 122-23.

pledged Esplanade or its assets as collateral for the Broadmark Loan, he did not misappropriate property, nor did he use property entrusted to another. To the contrary, Mr. Caldwell used *the property of CIL or Esplanade* in a manner that was consistent with the Esplanade PSA.

Because Plaintiffs did not entrust property belonging to them to Mr. Caldwell or CIL at any time, and because Mr. Caldwell did not misappropriate any property belonging to the Plaintiffs, the Section 523(a)(4) claim to establish nondischargeability for embezzlement fails. The Court need not reach the fraudulent intent element with respect to this claim. The Court dismisses the Third Claim.

## F. <u>Claim to Establish Nondischargeability Under Section 523(a)(6)</u>.

In their Fourth Claim, the Debtors assert that the debt owed to them by Mr. Caldwell should be deemed nondischargeable pursuant to Section 523(a)(6). Specifically, they contend that Mr. Caldwell induced them to enter into the Esplanade PSA by promising to pay the Esplanade Sale Notes while never intending to pay such debt, and then induced them to enter into the Forbearance Agreements despite never intending to repay the debts owed under the Esplanade Sale Notes, all in order to take out the equity from the Project for his own personal use and benefit. They assert his actions were malicious because he never intended to repay the indebtedness under the Esplanade Sale Notes, and because he knowingly caused the Project to fail after extracting the equity from the Project for his own use and benefit.

### 1. <u>Dischargeability Under Section 523(a)(6)</u>.

Pursuant to Section 523(a)(6) any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is nondishargeable. Establishing nondischargeability of a debt under Section 523(a)(6) requires proof of both a "willful injury" and a "malicious injury." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both* [willful and malicious injury], an objection to discharge under [Section 523(a)(6)] must fail.") (italics in original); *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 2022 WL 2679049, at *7 (10th Cir. Jul. 12, 2022) (unpublished) ("to determine nondischargeability under § 523(a)(6) we must review whether Mr. Bloom caused both a willful and malicious injury"). Stated differently, Section 523(a)(6) "requires proof of two distinct elements — the injury must be both 'willful' and 'malicious.' Analyzing and applying 'willful' *and* 'malicious' separately is the better approach." *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (10th Cir. BAP 2020) (emphasis in original).

To establish a willful injury, a creditor may use "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or . . . indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur." *Smith*, 618 B.R. at 912 (citations omitted). *See also Moore,* 357 F.3d at 1129 ("to constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the

consequences are substantially certain to result from it'") (brackets and ellipses in original); *Cocoma v. Nigam (In re Nigam)*, 780 Fed. Appx. 559, 563 (10th Cir. 2019) (unpublished table decision) (reaffirming *Moore* formulation of willful injury); *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, 2000 WL 1275614, at *3 (10th Cir. 2020) (unpublished) ("§ 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur.") It is a subjective standard. *Smith*, 618 B.R. at 912.

The standard for "malicious" injury is different than "willful" injury, however.

> [M]alicious injury requires "evidence of the debtor's motives." *In re Smith*, 618 B.R. 901, 919 (B.A.P. 10th Cir. 2020) (quotation marks omitted). To be malicious, the debtor must have "acted with a culpable state of mind vis-à-vis the actual injury caused the creditor." *Id*. (quotation marks omitted). The malicious injury requires that the action be "wrongful and without just cause or excuse." *Id.*

*Bloom*, 2022 WL 2679049, at *7. *See also Smith*, 618 B.R. at 919. The Tenth Circuit also explained:

> [P]ersonal animus is not a requirement for malicious injury. *Smith*, 618 B.R. at 919 (describing the requirements for malicious injury); *see also Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (explaining malicious injury means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will (quoting *In re Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996)).

*Bloom*, 2022 WL 2679049, at *7. So, malice can be shown if the injury was wrongful and inflicted "without just cause or excuse." *Wagner v Wagner (In re Wagner)*, 492 B.R. 43 55 (Bankr. D. Colo. 2013) (emphasis omitted); *Steward Software Co., LLC v. Kopcho (In re Kopcho)*, 2014 WL 3933657, at *6 (Bankr. D. Colo. Aug. 12, 2014). In assessing the presence or absence of "malicious injury," the totality of the circumstances must be examined. *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1527 (10th Cir. 1993) ("all the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-a-vis the actual injury caused the creditor" under Section 523(a)(6)); *Smith*, 618 B.R. at 919-20 (quoting *Pasek*'s "all the surrounding circumstances" language; and examining "the totality of the circumstances . . . to determine if a wrongful state of mind was present" when the defendant caused the injury to the plaintiff).

### 2. **<u>The Plaintiffs Have Failed to Meet Their Burden Under Section 523(a)(6)</u>**.

At the time the parties entered into the Esplanade PSA, they all believed in the promise of the Project. Indeed, Mr. Caldwell caused CIL to bring $591,769.62 to the closing of the Broadmark Loan, and, through the Broadmark Loan, caused the personal guaranties made by the Newbys to be extinguished, because he believed CIL would financially benefit from its purchase of Esplanade. However, very shortly after the Esplanade PSA, circumstances surrounding the Project changed, for reasons that were certainly not known to Mr. Caldwell when he entered into the deal with the Plaintiffs. Prices for construction materials and transportation increased due to the Covid 19 pandemic and the fire in Canada which depleted the lumber supply. Paulsen, faced with increased prices, walked away from the Paulsen Budget, leaving Mr. Caldwell with no option other than to seek rebids, and unable to build the Project, the cost of which had increased by about $7.5 million or more. The lenders for some of Mr. Caldwell's other projects in Colorado and Utah backed out, and Mr. Caldwell lost earnest money deposits and due diligence funding on such projects. In addition, the company that held the debt on 28 properties on which Mr. Caldwell or his entities had taken out bridge loans called the debt in, even though they were not in default, leaving Mr. Caldwell with no option other than to "fire sell" the properties.

Faced with significantly depleted assets, a Project that could not be completed in accordance with the Paulsen Budget as anticipated, and a terrible lending market, Esplanade was left without the ability to repay the bridge loan to Broadmark, let alone the Esplanade Sale Notes. It is unfortunate that Esplanade could not do so. But the Court is not convinced that Mr. Caldwell intended for the Esplanade Sale Notes to remain unpaid at the time he entered into the Esplanade PSA and signed the Esplanade Sale Notes, nor when he entered into the Forbearance Agreements. And, the Court cannot find that Mr. Calwell acted willfully or with malice when he failed to pay the Esplanade Sale Notes or to honor the Forbearance Agreements.

Further, and notwithstanding that Mr. Caldwell was held liable for breach of the Esplanade Sale Notes, the Court is not convinced that Mr. Caldwell actually damaged the Plaintiffs. Indeed, contrary to the Plaintiffs' contention, it appears that the Plaintiffs may have received more through the Esplanade PSA than they might have had CIL not purchased Esplanade,[160] and that it was Mr. Caldwell who got less than he bargained for.

---

160 The Plaintiffs asserted at trial and in their Written Closing Argument that they were damaged because they could have sold Esplanade to a different third-party cash buyer. At trial, however, the Court was presented with no documentary or even testimonial evidence providing details of any potential transaction with the prospective cash buyer, such as the identity of the prospective buyer or the proposed terms of the deal. The testimony was merely that the prospective purchaser would have cashed Mrs. Newby and PLR out completely. The Court is without any evidence that might have shed light on the question of whether such prospective deal might have paid Esplanade's debts in full, whether the Newbys' personal guaranties would have been extinguished, and/or whether any additional amounts would have been paid to PLR and Ms. Newby in exchange for their interest in Esplanade through such prospective deal. Given the absence of any evidence of the actual terms of a proposed contract, or the ability of the unknown prospective purchaser to purchase Esplanade or its properties, the Court cannot and does not credit the assertion that the Plaintiffs could had a "cash offer [of similar amount] to pay for the equity in [Esplanade]," nor that the Plaintiffs were harmed as a result of passing on the prospective offer. (Docket No. 51 at 28.) The argument is just speculation.

Prior to the time that the Plaintiffs sold their interests in Esplanade to Mr. Caldwell, they faced foreclosure on Esplanade's only asset of real value: the real property base for the Project, and thus loss of whatever equity they might have had in Esplanade. In addition to such loss, the Newbys faced the prospect of being left personally liable for any shortfall resulting from the foreclosure sale of Esplanade's real property. The evidence strongly indicates that it was only because of Mr. Caldwell's purchase of Esplanade that the Axiom Loan and the Miller Loan which encumbered Esplanade's real property were paid off and the Newbys' prospective personal liability extinguished. Mr. Caldwell received no ultimate benefit from the Esplanade PSA and the Broadmark Loan — to the contrary, when Broadmark foreclosed on Esplanade's properties, CIL's newly-purchased entity, Esplanade, lost the $591,769.62 Mr. Caldwell had put down as consideration for the Broadmark Loan, and Mr. Caldwell was left personally liable for any deficit arising from sale of the properties by virtue of his personal guaranty of the Broadmark Loan. Further, and though the Plaintiffs speculate in their Complaint and written closing argument that Mr. Caldwell used the proceeds from the Broadmark Loan for purposes other than paying the Esplanade Sale Notes, the Plaintiffs have presented no evidence that Mr. Caldwell in fact received any such proceeds. To the contrary, the evidence indicates that after payment of the various items required by the Esplanade PSA, Broadmark advanced no further funds to Mr. Caldwell or Esplanade. As a result, Mr. Caldwell was out money, not enriched.

Because the Plaintiffs have not demonstrated that Mr. Caldwell's debt to them is a debt "for willful and malicious injury," the Court dismisses the Fourth Claim under Section 523(a)(6).

## VI. <u>Conclusion and Orders</u>.

For the reasons set forth above, the Court finds that the Plaintiffs have not met their burden to establish the nondischargeability of the debt owed to them by Mr. Caldwell pursuant to Sections 523(a)(2)(A), (a)(2)(B), (a)(4), or (a)(6). The Court, therefore

ORDERS that judgment shall enter in favor of Mr. Caldwell and against the Plaintiffs on all four claims asserted in the Complaint.

DATED this 2nd day of September, 2026.

BY THE COURT:

Thomas B. McNamara

Thomas B. McNamara,
United States Bankruptcy Judge